NOTICE
This order was filed under Supreme
Court Rule 23 and may not be cited
as precedent by any party except in
the limited circumstances allowed
under Rule 23(e)(1).

2020 IL App (4th) 190613-U

NO. 4-19-0613

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
September 22, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| CHERRI BENEFIELD, as Independent Administrator of the Estate of Blayne Benefield, Deceased, | ) ) | Appeal from the Circuit Court of |
| Plaintiff-Appellant, | ) | De Witt County |
| vs. | ) | No. 15L17 |
| BIG H AMUSEMENTS, INC., a Former Illinois Corporation, and A & A ATTRACTIONS, INC., an Illinois Corporation, | ) ) ) | Honorable |
| Defendants-Appellees. | ) ) | Gary A. Webber, Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices DeArmond and Harris concurred in the judgment.

**ORDER**

¶ 1   *Held*: (1) The trial court did not err in denying plaintiff's motion to compel defendant to produce for deposition two of their former employees.

(2) Plaintiff did not prove the trial court erred in striking exhibits, in part or in whole, in support of plaintiff's opposition to the motion for summary judgment.

(3) Defendants were entitled to summary judgment as there is no genuine issue of material fact showing defendants' conduct in the alleged negligent hiring and retention of two employees was the proximate cause of plaintiff's injuries.

¶ 2   Plaintiff, in August 2015, filed a wrongful death and survival action against

defendants, asserting Big H Amusements, Inc.'s (Big H) negligent hiring and retention of James

and Alexander Jacquart caused the murder of Blayne Benefield. In August 2019, the trial court

granted summary judgment to defendants, finding no genuine issue of material fact on the

question of proximate cause. Plaintiff appeals the order, arguing (1) the trial court erroneously denied its fourth motion to compel discovery, in which plaintiff sought to compel defendants to produce two individuals for depositions; (2) the court improperly struck exhibits in part or in whole; and (3) the evidence was sufficient to create a genuine issue of material fact as to proximate cause. We affirm.

¶ 3                                I. BACKGROUND

¶ 4              Big H operated mobile amusement rides and attractions. In early September 2013, Big H took its rides, attractions, and employees to Farmer City, Illinois, for Farmer City's Heritage Days. On September 7, 2013, Blayne's body was found in a vacant lot on Main Street in Farmer City. Two Big H employees and brothers, James Jacquart and Alexander (Alex) Jacquart, were arrested. James is serving a 35-year sentence for murder; Alex is serving a 15-year sentence for dismembering a human body and a 3-year sentence for obstructing justice.

¶ 5                                A. The Complaint

¶ 6              In August 2015, plaintiff filed a wrongful death and survival action against Big H and its successor, A & A Amusements (A & A), seeking damages for the negligent hiring and retention of James and Alex. In her complaint, plaintiff alleged Big H breached multiple duties owed to Blayne and those breaches were the proximate and actual cause of Blayne's death. Among the duties allegedly breached was the duty not to hire or retain a person it knew or should have known had a particular unfitness for the position of traveling carnival worker so as to create a danger of harm to third persons.

¶ 7              According to plaintiff, Big H negligently hired or retained James and Alex as it knew or should have known James and Alex were not fit to be employed to work with the

traveling carnival. For example, plaintiff asserted James and Alex were alcoholics and drug addicts who often used while on the job. Both referred to local patrons as "town marks" and had a history of robbing and attacking locals. According to plaintiff, Big H knew James was violent and had threatened other employees, his supervisor, and "town marks." Plaintiff further asserted Big H failed to perform background checks that would have revealed James had a lengthy criminal history, including multiple charges and some convictions, since May 2007, for offenses such as felony possession of an improvised explosive device, negligent handling of burning material, misdemeanor disorderly conduct with injury, misdemeanor carrying a concealed weapon, second degree sexual assault, misdemeanor possession of drug paraphernalia, and criminal damage to property. Alex's criminal history included similar arrests. Alex had also been convicted, in September 2011, for felony second degree sexual assault of a child.

¶ 8                         B. Plaintiff's Fourth Motion to Compel Discovery

¶ 9             In July 2018, plaintiff filed her fourth motion to compel discovery, asking the trial court to compel the depositions of four witnesses, including Allen Jankowski and Christopher Scherer. Plaintiff argued defendants lied about the status of the employment of these witnesses and failed to produce them for depositions. Defendants denied fabricating the status of the witnesses, arguing they were transient carnival workers who would work for A & A at different times and not others. Defendants asserted their responses were honest and they had no duty to compel the testimony of the witnesses as they were no longer employed.

¶ 10            The facts show plaintiff requested the depositions of Jankowski and Scherer on September 11, 2017. The next day, defendants agreed to provide the two for depositions. On September 29, 2017, defendants confirmed Jankowski and Scherer were current employees of A

& A and proposed dates for the depositions. Approximately one month later, plaintiff issued notice for Jankowski's deposition to proceed on November 13, 2017. In early November, defense counsel learned Jankowski was no longer employed by A & A and lived in Kansas City. Defendants notified plaintiff they would be unable to produce him for the deposition. On January 10, 2018, before the trial court, defendants informed plaintiff both Jankowski and Scherer were no longer employed by A & A. After the motion to compel was filed, Robert Walicki testified he worked with Chris Scherer at A & A "a couple two or three days a week" in March 2018. Defendants' counsel asserted they learned during a deposition of another A & A employee that Scherer worked for A & A for a few weeks around March 2018.

¶ 11 The trial court found plaintiff had not shown defense counsel or defendants made any statement that was not true at the time it was made. The court observed the issue was with the duty to supplement. The court's understanding was the business was seasonal. The court found it was the duty of defendant to supplement those witnesses when they were rehired. The court recognized it would be a burden but concluded because it was a smaller number of names, there was no reason A & A could not keep track of those individuals. The court concluded it would not compel A & A to produce anyone not under its current employment. The court, however, ordered defendants to supplement the named witnesses listed in interrogatories 10 and 11, which included Jankowski and Scherer, should they become employed again by A & A. The court denied the request for sanctions and showed fact discovery would remain open until December 1, 2018.

¶ 12 C. Motion for Summary Judgment

¶ 13 In January 2019, defendants moved for summary judgment, alleging plaintiff

could not show the hiring and retention of the Jacquarts proximately caused Blayne's death.

¶ 14 In support of their motion, defendants emphasized the following facts: James and Alex worked at the Heritage Days Festival in Farmer City on September 6, 2013. Blayne twice went to the festival that day. He and his brother, Malachi Gottschalk, chaperoned a group of children at the festival. Later, Malachi and Blayne returned to play coin games. Later, Blayne left the festival to drink a beer at Wizzy's, a bar in Farmer City. Blayne then returned to the festival where he encountered Malachi. The two separated around 10:10 p.m. Malachi went home and Blayne went back to Wizzy's.

¶ 15 Two individuals who worked at Huck's convenience store in Farmer City testified they believed they saw James and Alex with a group of carnival workers inside Huck's at some point between 10 and 11:30 p.m. Beau Rick, a bartender at Wizzy's, first saw Blayne at Wizzy's around 9 or 10 p.m. Rick's deposition testimony showed James and Alex entered Wizzy's shortly after the carnival closed, which Rick believed was around 10 p.m. The brothers asked Rick for darts. Rick believed Blayne, James, and Alex threw darts and maybe played pool together: "[I]t seemed like everybody was getting along." Blayne "maybe" bought James and Alex drinks. The three were the last ones to leave the bar. They repeatedly asked for one more drink after closing time. During the evening, at 10:58 p.m., Blayne texted his friend Adam Coe, stating " 'may get jumped up here tonight, just as a warning. Bunch of drunk hillbillies in here talking about my hat, LOL.' " Coe texted, " 'then leave.' " Coe received a text, stating, " '[I]t's all good, bro. It takes a lot to run me off.' "

¶ 16 There is conflicting testimony about the bar in which Blayne, James, and Alex were until approximately 1:20 a.m.; however, two bartenders testified in their depositions the

three were drinking together. Rick testified the three stayed at Wizzy's until it closed around 1:20 a.m. on September 7, 2013. LaDonna Pearl, a bartender at Diamond Tap, testified the three were in Diamond Tap until closing around 1:20 a.m. She testified they were the last ones to walk out the door. At her deposition, Pearl testified James, just before leaving the bar, asked her if she had beer bottles for him. James explained to Pearl he had been in the bar earlier that day and asked the bartender to save beer bottles for a carnival game.

¶ 17 Around 2 or 2:15 a.m., Rick's father picked Rick up from work and the two stopped at Huck's. They pulled into the parking lot and saw Blayne, James, and Alex walking out of the parking lot toward Main Street. The three "had a bottle of booze and a couple of tall boys."

¶ 18 Todd Harpenau, at his deposition, testified he worked at Huck's on the night of September 6, 2013, to the early morning hours of September 7, 2013. Around 2:30 or 2:45 a.m., James, Alex, and Blayne entered Huck's. They wanted to buy alcohol, but Harpenau was not permitted to sell them alcohol after 2 a.m. Alex bought a root beer. James and Alex returned to Huck's around 5:30 a.m. They were wearing different clothing.

¶ 19 On the morning of September 7, 2013, law enforcement responded to a call of an apparent homicide in Farmer City. Blayne's body "was found naked in a lot next between 201 and 207 N. Main Street ***." According to Trooper Rodney T. Slayback, he provided a sworn statement for the complaint for a search warrant. In the sworn statement, Slayback reported Heritage Days was taking place in Farmer City. Slayback reported, "[V]arious rides, vehicles, and booths of Big H Amusements occupy Main [Street] near the aforementioned lot. Big H Amusements also put their power generator in a nearby lot for the carnival." Blayne's body had

stab wounds and cuts. The death-certificate worksheet indicates Blayne died by strangulation.

¶ 20                                    D. Plaintiff's Response

¶ 21        Plaintiff contended questions of fact as to proximate cause rendered summary judgment inappropriate. Plaintiff argued "one of the known perils of transient carnival work is the prevalence of criminal acts against locals in locales they are in for short periods of time, and carnival operators have a duty to make sure they hire transient carnival workers who are not unfit for such a known work peril." Plaintiff emphasized the questions of fact regarding the location of the murder and the instrumentalities used. Plaintiff stressed Blayne's body was found on a lot on Main Street, where a generator for Big H was located, and the brothers used Big H's property to conceal evidence of the murder. Plaintiff further referenced the facts showing Big H knew or should have known about James and Alex's criminal history, propensity for violence, and substance-abuse issues, as well as those showing James and Alex, residents of Wisconsin, would not have been in Farmer City but for their hiring by Big H.

¶ 22        Other facts emphasized by plaintiff included deposition and affidavit testimony regarding the Jacquarts' employment. At her deposition, Susan Headley, an owner of Big H and A & A, testified transportation was normally provided for the employees and neither James nor Alex had their own vehicle. Big H provided temporary housing that moved with the carnival for its employees. The employees provided their own meals. James and Alex worked for Big H in 2010 and again in 2013. Susan believed James returned to work for Big H over Father's Day weekend in 2013 in Mukwonago, Wisconsin. Alex and James were not considered "ride operators" as "they might be a ride operator one day, they might work at a game, they might work in food[; j]ust depends on where I need them."

¶ 23    To its response, plaintiff attached 54 exhibits, including multiple affidavits by James and Alex, deposition testimony, and police reports. In one of the affidavits, James averred his "job duties while working for Big H were not limited to only when the carnival was open." James further stated he would set up and tear down rides and, on the night of the incident, James "was trying to collect empty beer bottles from the bar where [he] was with Blayne, because [he] knew Big H needed them for the baseball game."

¶ 24                              E. Motion to Strike

¶ 25    Defendants moved to strike many of plaintiff's exhibits. Some were stricken, in whole or in part, and others were allowed to stand. Plaintiff does not appeal each decision to strike all or part of an exhibit. Those challenged on appeal largely appear in affidavits signed by James and Alex. Two stricken exhibits are police reports summarizing and including recorded statements of two Big H employees, including a supervisor of James. To avoid redundancy in this lengthy disposition, we will summarize the exhibits in the section below as we review the rulings as to each exhibit.

¶ 26                      F. Order Granting Summary Judgment

¶ 27    At the close of the hearing on the summary judgment motion, the trial court ruled in defendants' favor on the issue of proximate cause. The court found plaintiff presented evidence showing the Jacquarts did not live in or around Farmer City but were hired by a traveling carnival operation that brought employees with them, including the Jacquarts, to different locations. The court observed plaintiff could show the brothers were hired and were permitted to work even though defendants heard about some problems with the law and suggestions that they were in violation of the policy against drug use. The court found the cases

cited by plaintiff did not stand for the fact that the simple hiring of a person cannot be the proximate cause of injury "unless it's the actual nature of their job that leads to the death or the attack."

¶ 28   The trial court found there were no facts from which the jury could find the murder occurred on the premises of Big H or the carnival. The court rejected the suggestion that since the Jacquarts may have been "on call" to help fix a ride meant the Jacquarts were at work at the time of Blayne's murder, observing there was also no suggestion they were called in at that time. The court discounted the evidence showing James asked about beer bottles from a local bar upon finding James said he did so because he knew they could use them not that he was "on duty" at the time of the murder.

¶ 29   Concluding it could not "see anything about this particular case that would set it apart from [*Carter v. Skokie Valley Detective Agency, Ltd.*, 256 Ill. App. 3d 77, 628 N.E.2d 602 (1993)]," the trial court granted defendants summary judgment.

¶ 30   This appeal followed.

¶ 31                                    II. ANALYSIS

¶ 32                   A. Plaintiff's Fourth Motion to Compel Discovery

¶ 33   On appeal, plaintiff argues the trial court erred by not ordering defendants to produce Jankowski and Scherer for deposition. Plaintiff begins by arguing defendants made false statements as to their current employees, including Jankowski and Scherer, only disclosing the two for the first time at Susan Headley's deposition on September 7, 2017. Plaintiff further contends defendants asserted the two were not employees when they canceled the depositions, but plaintiff later learned defendants' assertions were false "as Scherer lived on Defendants'

- 9 -

property and worked for A&A until at least May 2018."

¶ 34    Plaintiff's argument is problematic for multiple reasons. First, plaintiff's citations to the record do not support her claims. For her first arguments about false statements, plaintiff string cites 12 places in the voluminous record, asking this court to determine for itself which statements were false. The pages cited in support of plaintiff's assertion Scherer lived on defendants' property until at least May 2018 do not mention Scherer. Second, plaintiff fails to cite any evidence the two worked for A & A at the time the motion to compel was filed or heard and provides no authority showing the trial court possessed the power to order defendants to produce Jankowski and Scherer if they were not employees. As defendants argue, Rule 204(a)(3) requires employers to produce their employees for deposition. Ill. S. Ct. R. 204(a)(3) (eff. July 1, 2014). Once an individual loses his or her status as an employee, the employer owes no obligation to produce him or her for a deposition. See *Spiller v. Continental Tube Co.*, 105 Ill. App. 3d 790, 793-94, 434 N.E.2d 850, 852-53 (1982) (finding the employer had no obligation to produce an employee that was retired); see also *Redmond v. Central Community Hospital*, 65 Ill. App. 3d 669, 674, 382 N.E.2d 95, 99 (1978) ("[W]e find no provision in Rules 201 through 218 allowing a party or a court to require a litigant to submit for deposition persons who are not under the control of that party and who necessarily would have to be subpoenaed to obtain their presence.").

¶ 35    Plaintiff has not convinced this court the trial court erred on this ground. We affirm the denial of the motion to compel.

¶ 36                    B. Background Law

¶ 37    In her opening brief, plaintiff begins her appeal of the trial court's rulings by

- 10 -

initially challenging the summary judgment order and follows with her argument regarding the order striking various portions of her exhibits. We find the better approach to resolving this appeal is to begin with the orders on defendants' motion to strike, identifying evidence as admissible or inadmissible, before turning to the question of whether summary judgment was properly granted. However, because a number of the exhibits were stricken in whole or in part on relevancy grounds, we start by determining the appropriate legal standards to apply in determining whether there is a genuine issue of material fact on the question of proximate cause.

¶ 38                    1. *Negligent Hiring or Retention*

¶ 39        To recover for negligent hiring or retention under Illinois law, a plaintiff must plead and prove the following: "(1) that the employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons; (2) that such particular unfitness was known or should have been known at the time of the employee's hiring or retention; and (3) that this particular unfitness proximately caused the plaintiff's injury." *Van Horne v. Muller*, 185 Ill. 2d 299, 311, 705 N.E.2d 898, 904 (1998); see also *Doe v. Coe*, 2019 IL 123521, ¶ 41, 135 N.E.3d 1. Under this theory of negligence, "the proximate cause of the plaintiff's injury is the employer's negligence in hiring or retaining the employee, rather than the employee's wrongful act." *Van Horne*, 185 Ill. 2d at 311. In general, the question of the existence of proximate cause is one of fact for the jury. *Carter*, 256 Ill. App. 3d at 81. If, however, the evidence is insufficient to prove the employer's negligence was the proximate cause of plaintiff's injuries, the employer is entitled to judgment as a matter of law. *Id.*

¶ 40        In their motion for summary judgment, defendants leave unchallenged the plaintiff's ability to present evidence as to the first two elements of the offense, asserting only

that plaintiff cannot prove the third, proximate cause.

¶ 41                                  2. *Proximate Cause in Illinois Negligence Law*

¶ 42          The parties base their proximate cause arguments on two distinct approaches found in Illinois negligence law. The first, the "condition vs. cause" dichotomy (see *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257-58, 720 N.E.2d 1068, 1072 (1999)), is the standard relied upon by defendants. Under this approach, liability does not attach if the initial wrongdoing was merely a condition that made the injury possible:

> "[I]f the negligence charged does nothing more than furnish a condition by which the injury is made possible and that condition causes an injury by the subsequent, independent act of a third person, the creation of the condition is not the proximate cause of the injury where the subsequent act is an intervening efficient cause which breaks the causal connection between the original wrong and the injury, and itself becomes the proximate or immediate cause." *Merlo v. Public Service Co. of Northern Illinois*, 381 Ill. 300, 316, 45 N.E.2d 665, 675 (1942).

The "condition vs. cause" approach does not end with the identification of an intervening cause. Instead, consideration must be given as to whether "the first wrongdoer might have reasonably anticipated the intervening cause as a natural and probable result of the first party's own negligence." *Id.* at 317. Only if the third party's act is "the immediate cause of the injury and is such as in the exercise of reasonable diligence would not be anticipated and the third person is not under the control of the one guilty of the original wrong, the connection is broken and the

first act or omission is not the proximate cause of the injury." *Id.*

¶ 43    The second standard in traditional proximate-cause analysis is the one set forth in *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 455-56, 605 N.E.2d 493, 502-03 (1992) (*First Springfield Bank*, 188 Ill. 2d at 257) and the one used by plaintiff. Under this standard, proximate cause is identified as having two requirements: "cause in fact and legal cause." *First Springfield Bank*, 188 Ill. 2d at 257-58. Cause in fact exists when the defendant's negligence was "a material and substantial factor in bringing about an injury" and it is reasonably certain the injury would not have occurred but for that negligence. (Internal quotation marks omitted.) *Mann v. Producer's Chemical Co.*, 356 Ill. App. 3d 967, 973, 827 N.E.2d 883, 889 (2005). In contrast, "legal cause" is a question of foreseeability. *First Springfield Bank*, 188 Ill. 2d at 258. The relevant inquiry as to legal cause is whether the injury is of a type "a reasonable person would see as a likely result of his or her conduct." *Id.*

¶ 44    Our supreme court has found both approaches, though employing different vocabulary, "ask the same question: Was the defendant's negligence a material and substantial element in bringing about the injury, and, if so, was the injury of a type that a reasonable person would see as a likely result of his or her conduct?" *Id.* at 258-59. The court explained the following:

> "[W]hen [*Merlo*] ask[s] whether the defendant's conduct was a
> cause of the injury or simply furnished a condition by which the
> injury was made possible, they are in effect asking whether the
> defendant's conduct was a material and substantial element in
> bringing about the injury. Similarly, when [*Merlo*] ask[s] whether

- 13 -

the defendant might have reasonably anticipated the intervening

efficient cause as a natural and probable result of his or her own

negligence, they are in effect asking whether the intervening

efficient cause was of a type that a reasonable person would see as

a likely result of his or her conduct." *Id.* at 259.

¶ 45        The *First Springfield Bank* court concluded the *Lee* decision articulated the

principle in general terms while those cases that used the "condition vs. cause" dichotomy

involved an intervening cause. *Id.* Despite having an intervening cause in its own set of facts, the

*First Springfield Bank* used the *Lee* standard to ascertain whether the original wrongdoing was a

proximate cause of the plaintiff's injuries. *Id.* at 260-61. We will follow the approach used in

*First Springfield Bank*.

¶ 46                              3. *Cause in Fact*

¶ 47        The parties do not agree on cause-in-fact considerations. In arguing cause-in-fact

cannot be satisfied here, defendants rely on *Carter*, in which the First District concluded

cause-in-fact in negligent hiring or retention required "a tangible connection between the

employee's violent tendencies, the particular job he is hired to do, and the harm to the plaintiff."

*Carter*, 256 Ill. App. 3d at 83. The *Carter* court, quoting the Second District's decision in *Bates*

*v. Doria*, 150 Ill. App. 3d 1025, 1032, 502 N.E.2d 454, 459 (1986), concluded "[i]f we were not

to hold as we do, 'an employer would essentially be an insurer of the safety of every person who

happens to come into contact with his employee simply because of his status as an employee.' "

*Carter*, 256 Ill. App. 3d at 83. *Bates* provides support for *Carter*'s tangible connection language.

*Bates* emphasizes liability for negligent hiring and retention requires plaintiff to prove his or her

injuries were "brought about by reason of the employment of the incompetent servant." *Bates*, 150 Ill. App. 3d at 1031. Relying on the Restatement (Second) of Agency, § 213, comment d (1958), the *Bates* court observed, before liability may attach, the injury must result "because of the employment." (Internal quotation marks omitted.) *Id.* at 1032.

¶ 48        Plaintiff argues the *Carter* and *Bates* "tangible connection" language is a test of foreseeability or the legal cause component of the proximate cause analysis, not cause in fact. We disagree with this use. The analysis in both *Carter* and *Bates* was limited to the cause-in-fact question. Neither court considered the foreseeability of the injury or whether legal cause was proven. See *Carter*, 256 Ill. App. 3d at 82-83; *Bates*, 150 Ill. App. 3d at 1031-32.

¶ 49        Additionally, plaintiff, citing *Escobar v. Madsen Construction Co.*, 226 Ill. App. 3d 92, 95, 589 N.E.2d 638, 639-40 (1992), argues an alternative means of proving cause in fact. According to plaintiff, cause in fact is established by evidence showing the injury occurred on the employer's premises or using the employer's chattel and the employer had reason to know of the need and opportunity for maintaining control over its employee. Plaintiff contends the record contains facts establishing the negligent hiring or retention of the Jacquarts was a cause in fact of Blayne's murder as the Jacquarts used their status as Big H employees in their planned attack on Big H's premises, using Big H's instrumentalities, while performing a job-related task.

¶ 50        Plaintiff misinterprets *Escobar*; no language in *Escobar* establishes a test for the cause-in-fact element of proximate cause. The language plaintiff relies upon, regarding the property and instrumentalities of the employer and the employer had reason to know of the need and opportunity for maintaining control over its employee, originates in section 317 of the Restatement (Second) of Torts. *Id.* (citing Restatement (Second) of Torts § 317 (1965)). Section

- 15 -

317 is entitled "Duty of Master to Control Conduct of Servant." Restatement (Second) of Torts § 317 (1965). Section 317 thus describes a "duty," an element distinct from proximate cause. See *Pavlik v. Wal-mart Stores, Inc.*, 323 Ill. App. 3d 1060, 1063, 753 N.E.2d 1007, 1010 (2001) (noting negligence claims require proof of a duty owed by the defendant, defendant's breach of that duty, and an injury proximately caused by that breach); see also *Anicich v. Home Depot U.S.A., Inc.*, 852 F.3d 643, 650-51 (7th Cir. 2017) (considering the burden of the duty arising from Section 317(a)). Not only does section 317 not refer to proximate cause, courts have regarded this section "as placing a significant restriction on an employer's liability for the acts of an employee that exceed the scope of the employment." *O'Rourke v. McIlvaine*, 2014 IL App (2d) 131191, ¶ 18, 19 N.E.3d 714. Moreover, we note *Escobar* involves a claim of negligent supervision in addition to negligent hiring and retention. *Escobar*, 226 Ill. App. 3d at 94. This case does not involve negligent supervision, which is a distinct cause of action from negligent hiring and retention. See *Coe*, 2019 IL 123521, ¶¶ 54-55. Plaintiff cites no case that relies on section 317's language in a case based solely on a claim of negligent hiring and retention. While the place of employment or the type of chattel used may be relevant in an inquiry as to actual cause, *Escobar* does not establish either fact alone or together necessarily satisfies cause in fact.

¶ 51        We find, under *Carter* and *Bates*, to establish the cause-in-fact component of proximate cause, the employment itself must be a substantial and material cause of Blayne's injury. With the underlying law in mind, we turn to the propriety of the orders striking exhibits from plaintiff's response to defendants' motion for summary judgment.

¶ 52                        C. Motion to Strike Plaintiff's Exhibits

¶ 53        The exhibits stricken by the trial court include affidavits, which are governed by

- 16 -

Illinois Supreme Court Rule 191(a) (eff. Jan. 4, 2013). Under Rule 191(a), affidavits "shall be made on the personal knowledge of the affiants ***." Ill. S. Ct. R. 191(a) (eff. Jan. 4, 2013). Among the requirements of the rule, the affidavits "shall set forth with particularity the facts upon which the claim *** is based," "shall not consist of conclusions but of facts admissible in evidence," and "shall affirmatively show that the affiant, if sworn as a witness, can testify competently thereto." *Id.* " 'An affidavit satisfies the requirements of Rule 191(a) if from the document as a whole it appears the affidavit is based on the personal knowledge of the affiant and there is a reasonable inference that the affiant could competently testify to its contents.' " *U.S. Bank National Ass'n v. Gagua*, 2020 IL App (1st) 190454, ¶ 76 (quoting *Madden v. F.H. Paschen/S.N. Nielson, Inc.*, 395 Ill. App. 3d 362, 386, 912 N.E.2d 1203, 1222-23 (2009)). Facts are not admissible in evidence if they are irrelevant. See, *e.g.*, *Moore v. Swoboda*, 213 Ill. App. 3d 217, 239-40, 571 N.E.2d 1056, 1071 (1991) (holding evidence not relevant to an issue of the case was inadmissible). Relevant evidence is evidence that has any tendency to make the existence of any fact of consequence to the determination of an action more or less probable than without the evidence. *Downey v. Dunnington*, 384 Ill. App. 3d 350, 381, 895 N.E.2d 271, 296 (2008).

¶ 54        Because an affidavit submitted in summary-judgment proceedings substitutes for trial testimony, "strict compliance with Rule 191(a) is necessary to ensure that trial courts are presented with valid evidentiary facts upon which to base a decision." *Enbridge Pipeline (Illinois), LLC v. Keifer*, 2017 IL App (4th) 150342, ¶ 49, 80 N.E.3d 142. As we are reviewing rulings on a motion to strike affidavits, in part or in their entirety, made in conjunction with a ruling on a motion for summary judgment, the proper standard of review is *de novo*. *Jackson v.*

*Graham*, 323 Ill. App. 3d 766, 773, 753 N.E.2d 525, 531 (2001). This court, on *de novo* review of the grant of summary judgment, examines the evidence anew to ascertain whether a material question of fact exists. *Coole v. Central Area Recycling*, 384 Ill. App. 3d 390, 396, 893 N.E.2d 303, 309 (2008).

¶ 55        Plaintiff argues the trial court erred by striking testimony in the affidavits, contending the affidavits were sufficiently specific and relevant to the issue of proximate cause. We will address each stricken exhibit individually.

¶ 56                                1. *Exhibit 1, Paragraph 5*

¶ 57        Exhibit 1 is an affidavit signed by James. In the affidavit, James averred he worked as a ride operator for Big H for several months in 2010. At that time, he "predominantly operated kiddy rides." Earl Samdahl, who worked for Big H, caught James drinking a screwdriver while operating the super slide. Samdahl reported the incident to James's supervisor. James was scolded but was allowed to continue working as a ride operator for Big H. James returned to work for Big H in May 2013. During his first week working for Big H in 2013, James "got into a fight with the locals and got arrested for disorderly conduct." James stated he was arrested a second time in 2013 and Susan Headley, an owner of Big H, picked him up after he was released from jail. James averred he was not given a drug test during his employment with Big H and he was "high on cannabis all the time while operating rides ***." Paragraph 5 of the affidavit states as follows: "Prior to September 7, 2013, other Big H employees informed me that Sue Headley helped two Big H employees escape arrest after they were involved in an incident in Arcola, Illinois, where one of them beat the shit out of a local and split his head open."

¶ 58        Paragraph 5 of the affidavit was stricken by the trial court. The court found no

- 18 -

foundation for the statement, emphasizing James did not specify from whom he learned the information.

¶ 59      On appeal, plaintiff argues the trial court erred by striking paragraph 5. Plaintiff argues "[p]rior to September 7, 2013" was sufficient as to the date and, under *Pavlik*, the failure to specify names of the employees should not have precluded consideration of the testimony.

¶ 60      As defendant argues, plaintiff's use of *Pavlik* is not convincing. The *Pavlik* court considered a challenge to deposition testimony regarding causation and an unnamed employee's admission rather than what constitutes proper foundation for a Rule 191(a) affidavit. See *Pavlik*, 323 Ill. App. 3d at 1065-66. In addition to plaintiff's failure to prove error for absence of specificity, plaintiff cannot show the stricken language is relevant to cause in fact. The statement bears no relevance to whether a tangible connection between the Jacquarts' employment and Blayne's injury exists. See *Maffett v. Bliss*, 329 Ill. App. 3d 562, 571, 771 N.E.2d 445, 453 (2002) (observing evidence tending to render a matter at issue more or less probable is relevant).

¶ 61                             2. *Exhibit 2*

¶ 62      Exhibit 2 is an affidavit signed by James. At the hearing on the motion to strike, plaintiff argued this was the most relevant to proximate cause. Exhibit 2 states the following:

> "1. Me and the other Big H employee involved in the fight
> in Mukwonago, "Dee," started the fight. I ran up and hit the first
> person I saw.
>
> 2. The fight in Mukwonago took place in the same park as
> Big H's carnival.
>
> 3. Dee had a wife or girlfriend, whose name I do not recall,

but during the fight she hit me in the head with a skateboard because I was choking one of the locals when I had him pinned on the ground, to stop me from choking him to death.

4. After I got out of custody in Mukwonago, [my supervisor] told me not to do it again but otherwise I was allowed to continue to work for Big H same as before the fight.

5. Dee's wife or girlfriend was also a Big H employee."

¶ 63    The trial court struck the entire affidavit as irrelevant. We agree. While relevant to breach of duty and legal cause, the affidavit does not tend to prove or disprove cause in fact. It was properly stricken.

¶ 64                                        3. *Exhibit 3*

¶ 65    In Exhibit 3, James averred he had been involved in another fight with a local after the Mukwonago fight and before Blayne's murder. He further averred another Big H employee, "Brett," beat another Big H employee. The affidavit states the following:

"1. At one of the carnival stops after Mukwonago, but before Farmer City, I beat the shit out of one local person who had tried to sell me fake pills. After beating him up, I took all his money. Another Big H employee witnessed this.

2. Another time before Farmer City, I and many other Big H employees saw Brett, a Big H employee, beat the shit out of another Big H employee, but they continued to both be employed.

3. The Big H rule on fighting was just do it after hours."

- 20 -

¶ 66　　　　　The trial court asked how the statement the employees "beat the shit out of one another" establishes a tangible connection. Plaintiff asserted the statement was relevant to showing Big H allowed its employees to engage in violence with locals and each other and did nothing to stop the violence. According to plaintiff, that conduct by Big H proximately caused Blayne to die when the carnival "rolled into town" and Big H hired "people it knew were getting into violent altercations with each other, with locals, and it took them from town to town."

¶ 67　　　　　The trial court struck the entire affidavit, finding it failed to meet the qualifications of an affidavit. The court found no specificity from which the defendants could investigate the allegation. We agree. The facts are not stated with particularity in compliance with Rule 191(a). Moreover, we find the stricken testimony irrelevant to cause in fact.

¶ 68　　　　　　　　　　　　4. *Exhibit 4, Paragraph 3*

¶ 69　　　　　Exhibit 4 is an affidavit signed by James. In the affidavit, James averred he and Alex owned many knives. James averred he had an eight- or nine-inch buck knife he carried while working. James averred he was told a few times to hide his knives while working, but he was not told he could not carry the knives. James recalled "telling other Big H employees that I would stab them if they pissed me off."

¶ 70　　　　　The trial court struck paragraph 3 of the affidavit, which states the following: "I was intoxicated the night/early morning of the incident. If I had ever been given a random drug test by Big H I would have been positive." The court found the paragraph lacked specificity, finding, under the rules, an affidavit shall presuppose "the person reading it is conversant in all the underlying facts of the case and will just know what the word incident refers to."

¶ 71　　　　　We need not decide if the trial court's ruling is erroneous, as any error would be

harmless. There is sufficient admissible evidence showing James had been drinking at the bars and at the convenience store. The statements are also irrelevant because they fail to demonstrate a tangible connection between the Jacquarts' employment and Blayne's death.

¶ 72                                        5. *Exhibit 5*

¶ 73            Exhibit 5 is an affidavit signed by James. James averred he first went to Farmer City in September 2013. He had not heard of Farmer City before his employment with Big H, knew no one who lived there, and went to Farmer City for work.

¶ 74            The trial court, on the ground the statements were speculative, struck the following two sentences: "Had I not worked for Big H I would not have ever gone to Farmer City" and "If [Susan] had not picked me up in Pontiac after I was released from jail I would not have gone on my own to meet up with the carnival and, thus, not worked for Big H any further."

¶ 75            We need not decide whether the trial court erred in striking these statements as speculative as the striking of such statement is harmless. Admissible evidence establishes Big H's hiring and retention of the Jacquarts is what brought them to Farmer City on September 6, 2013. The exclusion of this testimony had no effect on the outcome of the summary-judgment proceedings.

¶ 76                                        6. *Exhibit 9*

¶ 77            Exhibit 9 is an affidavit signed by Alex. The exhibit reads as follows:

                "1. My brother, James, is rash, impulsive, unmerciful,
                uncaring[, and] stupid. He had a bad temper and is violent when
                drunk, something that [his supervisor] knew about. James is
                dangerous.

2. Years ago, James stabbed me on two different occasions. Both times leaving me scarred. I told this to other Big H employees, including Jamie Hamline.

3. Prior to the Benefield incident, I have had to pull my brother off of somebody to prevent him from killing them; another time I had to take something from his hands before he beat someone to death."

¶ 78 The trial court struck the exhibit in its entirety. The court found the conclusions in the first paragraph were improper. The court further found Alex would be unable to testify as to what his supervisor knew. As to the second and third paragraphs, the trial court concluded the paragraphs lacked foundation and were too vague. The court further found the paragraphs lacked relevance to the proximate cause issue.

¶ 79 We find the statements did not comply with Rule 191(a) and are irrelevant to actual cause. They were properly stricken.

¶ 80 7. *Exhibit 11, Paragraph 2*

¶ 81 Exhibit 11 is an affidavit signed by Alex. Alex averred he had no prior connection to Farmer City. He knew no one from Farmer City and had no plans to visit there. In the second paragraph, Alex averred he would not have been in Farmer City if Big H had not transported him there. The trial court struck the second paragraph as speculative.

¶ 82 For the same reasons we affirm the order striking James's similar statements in Exhibit 5, we find no error here.

¶ 83 8. *Exhibit 13, Paragraph 2*

¶ 84        Exhibit 13 is an affidavit signed by Alex. Alex averred, on the night of Blayne's murder, James suggested the three go to the carnival midway. On the way, James told Alex that he planned to attack Blayne and he did. Alex stated, "Blayne's attack occurred at the carnival midway, only about 20 feet away from Big H's carnival ride."

¶ 85        In the second paragraph, Alex alleged the following: "After the attack, I went around and picked up the items I thought could implicate James and myself in the attack, as they would have our fingerprints on them, and took 3 items—a flag pole, rake, and wooden stick, and hid them in the storage area of the super slide, one of Big H's rides that was close to the attack."

¶ 86        The trial court struck the second paragraph upon finding it irrelevant to the issue of proximate cause.

¶ 87        Such testimony was presented to support plaintiff's contention Big H was liable for injuries caused by its chattel. We find the statements regarding the conduct of the Jacquarts that occurred after Blayne's murder are irrelevant to the question of whether Big H's breach of its duty is connected to the injuries.

¶ 88                                9. *Exhibit 14, Paragraph 4*

¶ 89        Exhibit 14 is an affidavit signed by Alex. Alex explained James attacked Blayne by strangling him in a choke hold. James then stabbed Blayne with Alex's knife. Alex "failed to stop the attack." In the fourth paragraph, Alex stated he "hid items after the attack to try and cover it up." The trial court struck the fourth paragraph, finding it irrelevant to the issue of proximate cause.

¶ 90        For the same reason we found no error in the trial court's striking portions of Exhibit 13, we find no error here.

¶ 91                               10. *Exhibit 15, Paragraph 1*

¶ 92          Exhibit 15 is an affidavit signed by Alex. In the first paragraph, Alex stated the following: "Prior to the [Blayne] incident, I had heard that [Susan] had put Paul Tafoya up in a motel to avoid arrest because he had an active arrest warrant, similar to what she did the morning of Sept[ember] 7, 2013."

¶ 93          The trial court, finding the statements made in the first paragraph lacked foundation, struck the paragraph. Without considering the specificity of the stricken paragraph, we find the statement irrelevant to actual cause.

*¶ 94*                               11. *Exhibits 34 and 35*

¶ 95          Exhibit 34 is an "I-Case Supplementary Report" prepared by Trooper Katherine Star Richardson of the Illinois State Police, documenting the September 7, 2013, interview of Earl Samdahl. Trooper Richardson and Sergeant Tony Monaghan of the De Witt County Sheriff's Office conducted the interview. It also contained the video interview of Samdahl. According to the report, the interview was video- and audio-recorded. Samdahl reported he was a carnival worker who worked with Big H for approximately 13 years. Samdahl provided his impressions of James and informed the officers of incidents in which James threatened to beat people.

¶ 96          Exhibit 35 is also an "I-Case Supplementary Report" prepared by Trooper Richardson, documenting the September 7, 2013, interview of Jamie Hamline, as well as a video-recorded interview. Trooper Richardson and Sergeant Monaghan conducted the interview, which was also video- and audio-recorded. In short, Hamline reported James had an evil side and often told stories about how he tried to kill his own brother. James admitted to Hamline he had

- 25 -

killed a person who said something about James's daughter. Initially, Hamline did not believe James, but later found the shirt James was wearing and it had blood. Jamie also referred to incidents James had with other carnival employees.

¶ 97        Defendants moved to strike the exhibits on the bases the exhibits were police reports that were inadmissible as hearsay and the recorded statements were unverified. Plaintiff responded the police reports were included only for the court to have a record document; plaintiff was relying upon the actual audio and video files of the interviews. Plaintiff further argued the audio and video statements were verified by Trooper Richardson, who testified she was one of the officers present. Plaintiff argued the statements, particularly by Samdahl, who was a supervisor for Big H, should be imputed to defendants. Plaintiff argued Samdahl's and Hamline's statements were statements against interests, showing how violent James was, the fights with other employees, and admissions to the crime.

¶ 98        The trial court found the statements were not related to the scope of the Samdahl's employment. There were no facts establishing the scope of their employment was hiring an employee or making a determination about firing. The court found problematic this was not sworn testimony. The court found "[n]othing in this *** falls within the scope of their employment or would constitute an exception to the hearsay rule" and struck both Exhibits 34 and 35.

¶ 99        On appeal, plaintiff argues the trial court erred in finding the statements were inadmissible hearsay. In support, plaintiff relies on only one case, *Pavlik*. *Pavlik*, however, does not concern the admissibility of police reports or unverified recordings. See *Pavlik*, 323 Ill. App. 3d at 1065-66. *Pavlik* addresses the admissibility of a statement made by an unnamed employee

- 26 -

during the employment relationship about a matter within the scope of her employment. *Id.* The victim of a slip-and-fall incident reported that statement in her deposition. *Id.* at 1064. Plaintiff fails to provide any authority to support her claim the police reports and the unsworn testimony the reports summarize are admissible evidence in summary-judgment proceedings. In her reply brief, plaintiff cites one case to establish police reports are generally not accepted. She then asserts, with no citation to authority, "[t]he fact that a recorded statement is included as an attachment to a police narrative report does not render it inadmissible."

¶ 100          Plaintiff's failure to provide relevant authority renders her claim forfeited: "A point not argued or supported by citation to relevant authority fails to satisfy the requirements of Supreme Court Rule 341(h)(7), (i)." *People ex rel. Illinois Department of Labor v. E.R.H. Enterprises*, 2013 IL 115106, ¶ 56, 4 N.E.3d 1. A court of review "is not simply a depository into which a party may dump the burden of argument and research." *Id.*

¶ 101          We note the recorded statements of both Samdahl and Hamline, even if admissible, would not support a finding of actual cause. At best, the two statements show James operated a "Safari Train" ride and suggested he would be asked to assist in setting up and taking down the rides. The statements combined further show after the carnival closed for the evening, the employees were taken to the fairgrounds where the employees were staying. James was taken with the employees back to the housing.

¶ 102                              D. Summary Judgment

¶ 103          Having considered the trial court's decisions admitting the evidence, we turn to the question of whether summary judgment in defendants' favor is appropriate. In summary judgment proceedings, the purpose is not to try a factual issue but to determine whether a

- 27 -

genuine issue of material fact exists. *Enbridge Pipeline (Illinois), LLC v. Temple*, 2017 IL App (4th) 150346, ¶ 69, 80 N.E.3d 784. Summary judgment may be granted when the pleadings, depositions, admissions, and affidavits on file, when viewed in the light most favorable to the nonmovant, shows no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *Id.* To survive a summary judgment motion, the nonmovant need not prove his or her case but must present a factional basis arguably entitling him or her to judgment. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 12, 21 N.E.3d 684. Summary judgment orders are reviewed *de novo*. *Village of Bartonville v. Lopez*, 2017 IL 120643, ¶ 34, 77 N.E.3d 639.

¶ 104        To establish there is no genuine issue of material fact on the question of proximate cause, and thus summary judgment is appropriate, defendants rely heavily on the *Carter* decision. In *Carter*, the court overturned a jury verdict upon finding the act of Skokie Valley Detective Agency, Inc. (Skokie Valley), in hiring and retaining Terry Harris as a security guard, was not a cause-in-fact of Emma Hopkins's death. See *Carter*, 256 Ill. App. 3d at 78. When Skokie Valley hired Harris, no background check was run. *Id.* at 79. Harris was provided a Skokie Valley patch to sew on his uniform. *Id.* He was told to report for duty at the Amoco station at Pulaski and Division Streets in Chicago. *Id.* Emma worked as a cashier at the same Amoco station. *Id.* On the afternoon of October 28, 1984, Harris arrived at the Amoco station, in uniform and carrying his gun. *Id.* Harris told Emma and one of her coworkers he was not scheduled to work at that location that day. *Id.* Harris explained he was assigned to work elsewhere and asked Emma for a ride. *Id.* She agreed, and the two left together. Emma's body was discovered the next morning. *Id.*

¶ 105        The *Carter* court found the fact Harris was a security guard did not cause Emma

to allow him into her car, finding "it was the fact that she trusted him because she knew him from work where he happened to be employed as a security guard." *Id.* at 82-83. The court concluded "[i]f we followed [the plaintiff's] reasoning then we would have had to find Skokie Valley liable if, after leaving the Amoco station alone, she had seen him on the street out of uniform and offered him a ride or if they ran into each other on a weekend at the supermarket." *Id.* at 83. The court found, "We do not believe the concept of proximate cause should be extended this far." *Id.* The *Carter* court concluded with the following language that has been repeatedly cited by other courts since: "[T]here must be a tangible connection between the employee's violent tendencies, the particular job he is hired to do, and the harm to the plaintiff. *** If we were not to hold as we do, 'an employer would essentially be an insurer of the safety of every person who happens to come into contact with his employee simply because of his status as an employee.' " *Id.* at 83 (quoting *Bates*, 150 Ill. App. 3d at 1032).

¶ 106        Defendants argue Blayne's murder had less of a relationship to the Jacquarts' employment than the murder in *Carter*. Defendants emphasize the Jacquarts' meeting with Blayne was a coincidence, whereas the defendant in *Carter* met the victim at work.

¶ 107        Plaintiff counters by distinguishing *Carter*, arguing the Jacquarts used their status as Big H employees in their attack on Blayne, which occurred on Big H's premises, using Big H's instrumentalities, while they were performing a job-related task. Plaintiff points to James's statement he suggested to Blayne and Alexander that they hang out at the carnival midway and, when Blayne was last alive, they were " 'mere feet away from Big H's carnival rides, inside a lot at the carnival midway.' " Plaintiff further emphasizes the testimony of Pearl that James was trying to collect beer bottles for the carnival.

- 29 -

¶ 108    We are not convinced summary judgment is appropriate under *Carter*'s facts. Given the facts presented in the disposition, the question of the connection in *Carter* between the murderer's employment and the victim's rape and murder seems strong. The parties worked together. The murderer wore a security uniform, was hired by a security company, met the victim through both of their employment, and used work as an excuse to get the victim in his car.

¶ 109    We are, however, convinced summary judgment is appropriate under the legal standards set forth in *Carter* and *Bates*. As *Carter* and *Bates* establish, the employment itself must be a substantial and material cause of Blayne's injury. The evidence shows, because of Big H's employment of the Jacquarts, the Jacquarts were in Farmer City during Heritage Days. The evidence does not arguably establish because of Big H's employment, the Jacquarts were in the Farmer City bars. While plaintiff attempts to characterize the evidence as showing James went to the bars to acquire beer bottles for a carnival game, there is no evidence to suggest Big H sent him to find those bottles. Pearl's testimony shows only that James asked about the bottles; she had no knowledge of his reasons for doing so. James's affidavit is that he asked for beer bottles because he "knew Big H needed them for the baseball game." According to the evidence, it is not arguable James was in the bar because of his employment. It is also not arguable because of his employment James stayed in the bars for hours, drinking and fraternizing with Alex and Blayne. The evidence further does not arguably show because of the employment, they met Blayne or, because of that employment, Blayne decided to leave the bar with his attackers. Distinct from other cases involving a security worker (see, *e.g.*, *Elliott v. Williams*, 347 Ill. App. 3d 109, 111, 114-15, 807 N.E.2d 506, 509, 511 (2004)) or a pastor (*Coe*, 2019 IL 123521, ¶ 1), there is also nothing inherent in the position of carnival worker to assure Blayne of his safety in

relying upon them. The connection between the employment of the Jacquarts and Blayne's murder is too tenuous to be a substantial and material cause of Blayne's injuries.

¶ 110        Plaintiff's cases are distinguishable and do not support a contrary finding. For example, in *Easley v. Apollo Detective Agency, Inc.*, 69 Ill. App. 3d 920, 932, 387 N.E.2d 1241 1248-49 (1979), the facts establish the employment itself was an actual cause of the plaintiff's injuries. The *Easley* attacker worked as a security guard for a company hired to secure the building in which the victim had an apartment. *Id.* at 923. The attacker, wearing his uniform, used a passkey he acquired from his employment to enter the victim's apartment, in which he assaulted the victim. *Id.* The court in *Malorney v. B & L Motor Freight, Inc.*, 146 Ill. App. 3d 265, 269, 496 N.E.2d 1086, 1089 (1986), did not consider the issue of proximate cause. The court considered only whether the transportation company that hired a driver and furnished him a truck with a sleeping compartment owed a duty to the 17-year-old hitchhiker the driver raped and murdered. *Id.* at 266-67. Like in *Malorney*, in *Gregor v. Kleiser*, 111 Ill. App. 3d 333, 443 N.E.2d 1162 (1983), the issue of proximate cause was not involved. The Second District found the complaint, in which the plaintiff alleged the employer was aware of its employee's violent reputation and propensity for violence, supported a cause of action for negligent hiring. *Id.* at 338-39. In *Elliott*, 347 Ill. App. 3d at 111, 114-15, evidence established it was arguable the victim allowed her attacker into her apartment because he was a security guard in the building: he was wearing the hat from his security guard uniform when he knocked on her door and he assisted her earlier in the evening in that role. In *MacDonald v. Hinton*, 361 Ill. App. 3d 378, 387-88, 836 N.E.2d 893, 902 (2005), the court found the complaint did not contain facts supporting a negligent hiring claim and did not address proximate cause.

¶ 111                                III. CONCLUSION

¶ 112          We affirm the trial court's judgment.

¶ 113          Affirmed.